CAMPFIELD and another *v.* LANG and others.

*(Circuit Court, E. D. Wisconsin.* August, 1885.)

ASSIGNMENT FOR BENEFIT OF CREDITORS — WISCONSIN STATUTE — PREFERENCES — EXCEPTIONS IN FAVOR OF LABORERS.

    A statute of Wisconsin (1 Laws Wis. 1883, c. 349) provides that "any and all assignments hereafter made for the benefit of creditors which shall contain or give any preference to one creditor over another creditor, except for the wages of laborers, servants, and employes, earned within six months prior thereto, shall be void." L., a manufacturer, entered into a contract with B., who was also a manufacturer, by which B. was to saw a quantity of lumber for L. at the stipulated price of $15 per thousand feet. The lumber was fur-nished by L., and the sawing was done at B.'s establishment. The work re-quired the use of B.'s machinery and the labor of his employes. *Held,* that the relation of the parties was that of contractor and contractee; that in doing the work B. was not a laborer, servant, or employe of L. within the meaning of the statute; and that a preference in favor of B., in an assignment made by by L., was illegal, and invalidated the assignment as to a creditor attacking it.

At Law.

*Shepard & Shepard,* for plaintiffs.

*E. Coleman,* for the garnishee.

DYER, J. On the fourteenth day of April, 1884, D. C. & J. H. Lang, a firm engaged in the business of manufacturing trunks, at Fond du Lac, made an assignment to the garnishee, Simmons, pursuant to the statute of this state authorizing voluntary assignments by insolv-

ent debtors, and therein directed that the debts, demands, and liabilities due to certain creditors, including Bates & Barrett, a firm of manufacturers at Fond du Lac, be paid to them as wages earned within six months prior to the date of such assignment, in preference to other creditors of said assignors. The plaintiffs in this action were creditors of D. C. & J. H. Lang, and brought suit against them in this court to recover the amount of their demand, in which suit they recovered judgment on the fifteenth day of July, 1885, for the sum of $822.72. Concurrently with the institution of that suit, garnishee proceedings were commenced against Simmons, the assignee of D. C. & J. H. Lang; and upon issue duly joined, pursuant to the forms of statutory procedure existing in the state, the plaintiffs now seek to compel the assignee to pay the amount of their judgment from assets of the insolvent firm alleged to be in his hands. The contention of the plaintiffs is that, as to them, the assignment is void, for the reason that it provides for an unlawful preference in favor of Bates & Barrett.

The issue between the plaintiffs and the garnishee was tried before the court, and upon the trial the following facts were elicited: Bates & Barrett were a firm engaged in the manufacture of various kinds of wood-work in Fond du Lac. They had shops with machinery therein, which were operated by steam-power. They employed a limited number of men in their business. The firm of D. C. & J. H. Lang were manufacturers of trunks, and an arrangement was made between the two firms by which D. C. & J. H. Lang were to furnish Bates & Barrett with a cargo of lumber, which, for certain specified compensation, was to be sawed up into slats at the shops of the latter firm, for use ·by the assignors in the manufacture of trunks. The contract between the parties was verbal, and by virtue thereof Bates & Barrett were to be paid for the work of sawing up the lumber at the rate of $15 per thousand feet. It seems to have been contemplated by the parties that the work would continue through a considerable period, as the sawing was to be done only so fast as D. C. & J. H. Lang should require the manufactured material for use in their business. As the sawing progressed, Bates & Barrett were to be paid $50 per month, and at the close of the service a settlement was to be had, and whatever balance should then be found to be due to them was to paid by D. C. & J. H. Lang, on the basis of $15 for every thousand feet of lumber sawed.

In pursuance of this contract, D. C. & J. H. Lang caused to be delivered at the shops of Bates & Barrett a cargo of lumber which was sawed up by them, and as fast as sawed the material was delivered to the assignors. Payments at the rate of $50 per month were made to Bates & Barrett as the sawing progressed, and when the work was fully completed, upon a settlement between the parties it was ascertained that D. C. & J. H. Lang were indebted to Bates & Barrett in the sum of $150. This balance was not paid, and in the assignment

v.25F,no.3—9

the assignors declared a preference in favor of Bates & Barrett for such indebtedness, scheduling them as preferred creditors, and listing such indebtedness as wages due to them as their laborers, servants, and employes. The shops of Bates & Barrett were entirely distinct from those of D. C. & J. H. Lang. The lumber sawed was furnished exclusively by D. C. & J. H. Lang, and the work done by Bates & Barrett involved the use of the steam power and machinery in their shops, and the manual labor of their employes.

On the fourth day of April, 1883, the legislature of this state passed an act, by the first section of which it was provided that "any and all assignments hereafter made for the benefit of creditors which shall contain or give any preference to one creditor over another creditor, except for the wages of laborers, servants, and employes earned within six months prior thereto, shall be void." 1 Laws Wis. 1883, c. 349. Before the passage of this act, assignments of insolvent debtors containing preferences in favor of any creditors or class of creditors were lawful. The question here in controversy is whether the relation of Bates & Barrett to D. C. & J. H. Lang, in the transaction before stated, was that of laborers, servants, or employes within the meaning of the statute. The question is one of importance, since it involves the interpretation of a new enactment not yet passed upon by the supreme court of the state, and which is declaratory of a radical change, in one respect, of the law of assignments in this state.

As before observed, preferences without restriction as to individual creditors, or classes of creditors, in voluntary assignments, were lawful before the passage of this statute. A debtor might select any favored creditor, or body of creditors, and provide for their payment in full, leaving, perhaps, an inconsiderable percentage of his assets —perhaps nothing—for distribution among other creditors equally meritorious, thus making an assignment in many cases an injury to some creditors rather than a benefit to all. The exercise of this privilege grew to be an evil. The legislature intended to uproot the evil by taking away from the debtor the right thus to discriminate among his creditors, except to a very limited extent, and emphasized its intention by declaring that any assignment which shall contain a preference to one creditor over another, except for wages of "laborers, servants, and employes," earned within a limited period, shall be void; by which is meant, of course, void at the instance of a creditor attacking it. From the use of the words "laborers, servants, and employes" it seems evident that the legislature had in contemplation a class of persons dependent upon their daily, weekly, or monthly "wages" for the maintenance of themselves and families; a class dependent upon their daily and personal labor, and very liable to be left, upon the failure of their employer, in a necessitous condition if their demands should not be preferred.

Interpreting the act consistently with the legislative intent as fairly

implied from the language used, and the known mischief to be remedied, did Bates & Barrett, the preferred creditors in the assignment, by virtue of their transaction with D. C. & J. H. Lang stand towards them in the relation of "laborers, servants, or employes?" I am of opinion that they did not. The service they performed in sawing up the lumber was done under express contract, and the relation established between the parties was one of contract, involving the employment of capital, machinery, and shop facilities on the part of Bates & Barrett, and the labor of their employes. They were not "laborers, servants, or employes" in the sense in which those words are used in the statute. They were not to be paid "wages" in the sense in which that term is also used in the statute. For sawing the lumber they were to be paid, and were paid, so much per thousand feet. This was the basis of their compensation, although as the work progressed they were to receive monthly payments of $50 to apply on the contract price. All the rights and liabilities of the parties sprung from contract, and the character of the relation created by the contract was essentially different from that existing between master and servant, employer and employe.

A servant is one who is engaged, not merely in doing work or services for another, but who *is in his service*, usually upon or about the premises or property of his employer, and subject to his direction and control therein, and who is generally liable to be dismissed. *Heygood* v. *State*, 59 Ala. 51. If a person is engaged under a contract in an independent operation, not subject to the direction and control of his employer, the relation is not regarded as that of master and servant, but is said, in modern phrase, to be that of contractor and contractee. *Forsyth* v. *Hooper*, 11 Allen, 419. The term "laborer" is used in the statute in its popular and usual sense. The statutory provision was designed to permit a preference in favor of the ordinary laborer who earns compensation and receives "wages" for his personal work, and not in favor of one who contracts for the employment of his capital or the use of his manufacturing establishment for the benefit of another. The word "employes," as also used in the statute, may be well said to be qualified, and to some extent limited, by its association with the words "laborers" and "servants," according to the maxim *noscitur a sociis*. All these terms are used in the statute in their common acceptation, indicating persons hired for wages to work as the employer may direct, and not embracing the case of the employment of a person carrying on a distinct trade or calling to perform service independent of the control of the employer, such as was here rendered by Bates & Barrett.

This view is strengthened by the fact that the word "wages" is used in the statute; by which is meant "that which is paid or stipulated for services, but chiefly for services for manual labor." We speak of a laborer's wages, or a servant's wages, or an employe's wages, but do not ordinarily apply the word to a contractor's compensation

which he receives as a reward for the use of his capital or machinery, or the service of his employes, in the business, or for the benefit of another under a contract. The application of the word "wages" to "laborers and employes certainly conveys the idea of a subordinate occupation which is not very remunerative; one of not much independent responsibility, but rather subject to immediate supervision." *Railroad Co.* v. *Falkner*, 49 Ala. 118. See, also, 6 Jac. Law Dict. 382, and 3 Toml. Law Dict. 655.

As before indicated, in seeking for the legislative intent we should give to the language of the statute its ordinary signification. The intent here was to permit preferences in favor of a class of persons who are wholly dependent upon their toil for subsistence, and whose probable necessities, arising from the nature of their employment, justly entitle them to some protection. Having in view the mischief to be remedied, it is not allowable to give the statute such a latitudinarian construction as would lead to evasions of its provisions. It is a remedial statute as to the class of persons therein specifically defined, but it is also stringently restrictive as to all other classes, and should not be extended beyond the fair import of its terms. Preferences, as heretofore permitted, were opposed to the rule of equality. And as equality is equity, and as the statute was intended to enforce the principle of equity in the distribution of the assets of an insolvent debtor among his creditors, it should be strictly construed, to the end that its purpose may not be defeated.

As having some bearing upon this question it may be observed that a statute of this state provides that the earnings of all married persons and of all other persons who have to provide for the entire support of a family in this state, for 60 days next preceding the issuing of any process of attachment, execution, etc., shall be exempt from seizure on such process. In *Brown* v. *Hebard*, 20 Wis. 326, the supreme court had occasion to determine the meaning of the word "earnings" in this statute; and Mr. Chief Justice DIXON thought a correct definition to be "the gains of the debtor derived from his services or labor without the aid of capital. If the debtor has no capital and no credit contributing to increase his profits, except the credit arising from the labor or service in which he is presently engaged, and out of the proceeds of which his obligations on account of such labor or service are to be discharged, then * * * his net receipts or gains from such labor or service may fairly be accounted 'earnings.'" Thus the meaning of that word was restricted to the gains of labor without the aid of capital; and the word "earnings," as commonly used, is certainly of more comprehensive signification than the word "wages." In *Kuntz* v. *Kinney*, 33 Wis. 510, it was held that earnings included not only the fruits of personal labor, but also what might be earned within the prescribed period by the aid of the debtor's team; but this ruling was placed on the specific ground that the team was itself exempt property.

It is contended in support of the assignment that if the preference in favor of Bates & Barrett was illegally made, it was a mistake, within the meaning of the assignment law of the state, that ought not to vitiate the assignment. The statute (section 1697, Rev. St. Wis.) provides that within a prescribed time after the execution of an assignment the assignor shall make and file an inventory of his assets and a list of his creditors, etc.; that a failure to make and file such inventory and list shall render such assignment void; and then declares that "*no mistake therein* shall invalidate such assignment or affect the right of any creditor." The supreme court of the state, in *Farwell* v. *Gundry*, 52 Wis. 268, S. C. 9 N. W. Rep. 11, held that this includes *mistakes of law;* and so it is urged that if the preference in question was unauthorized by the statute, it was but a mistake of law to make it, and ought not, therefore, to vitiate the assignment. But this position is wholly untenable, because the preference is declared in the assignment itself; it is an integral part of that instrument, and it is to be observed that the mistake spoken of in the statute is a mistake in the inventory of assets and list of creditors, which are not part of the instrument of assignment, but are made and filed as steps in the statutory course of procedure subsequent to the execution of the assignment.

On the whole, the conclusion must be that the preference in favor of Bates & Barrett was illegal, and invalidated the assignment as to the plaintiff creditors; and they will have judgment against the garnishee defendant for the amount of their demand.