### In re FOOTVILLE CONDENSED MILK CO.

### In re VALECIA CONDENSED MILK CO.

#### (District Court, W. D. Wisconsin. April 18, 1916.)

BANKRUPTCY ⬤⟿348—CLAIMS—PRIORITY—"WORKMEN"—"SERVANTS."

Bankruptcy Act July 1, 1898, c. 541, § 64b, 30 Stat. 563 (Comp. St. 1913, § 9648), declares that claims for wages due to clerks or servants, etc., earned within three months before the commencement of the proceedings, shall be entitled to priority. Bankrupt milk companies engaged claimants to haul milk from surrounding producers to the factory, claimants to be paid according to the amount of the milk hauled, with a fixed minimum. The amounts per hundred paid claimants were deducted from the price paid the producers. Claimants had their own routes and supplied their teams and equipment, and were entitled, if the amount of milk hauled warranted, to engage assistants. *Held*, that though claimants performed services and engaged in manual labor, they were not "workmen" or "servants" within the act; there being no direct supervision of their conduct by the bankrupts, but instead their status was similar to that of expressmen, draymen, or other independent contractors.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 536; Dec. Dig. ⬤⟿348.

For other definitions, see Words and Phrases, First and Second Series, Servant; Workman.]

In Bankruptcy. In the matter of the bankruptcy of the Footville Condensed Milk Company. The claim of Charles Demerow was allowed by the referee as a preferential claim owing to a clerk, servant, or workman, etc. In the matter of the bankruptcy of the Valecia Condensed Milk Company. The claim of Phillip Meister was allowed as preferential because owing to a clerk, servant, or workman, etc. Proceedings to review the allowance of such claims. Determinations of referee reversed, and claims held not entitled to priority.

These matters were argued together, Demerow filing a claim against the bankrupt Footville Condensed Milk Company for $144; Meister against the bankrupt Valecia Condensed Milk Company for $149.39. Each alleged the sum to be due from his debtor for services rendered during February and the first 26 days of March, 1915.

The cases present a question arising upon many other claims against each estate, aggregating something like $7,000 or $8,000, filed in the two proceedings. That general question is, Are or were such claimants, who were engaged by the respective bankrupts to haul milk to the condenseries, workmen, clerks, or servants, and as such entitled to priority of payment of their claims under section 64b (4) of the Bankruptcy Act? It is assumed that the facts adduced upon the hearing of these two claims disclose fairly the situation in general, and therefore they will be summarized.

The claims are for the compensation alleged to be due for hauling to the factory the milk bought by the company from farmers or dairymen. The price per hundred pounds of raw milk was fixed by the company from time to time by quotations or offers, and upon a basis at "receiving room," "plant," or factory, as the case may be. The price was based upon a specification of a milk test showing 3.5 butter fat. For each $1/10$ per cent. increase of butter fat the price per hundred pounds of milk increased 1 cent. Thus, if the quoted price were $1.20 per hundred pounds testing 3.5, the price on a test of 3.6 would be $1.21. Now, if the farmer delivered the milk himself, he received the full quoted price per hundred pounds upon the test which developed. As a matter of fact many farmers did not produce enough to warrant the expenditure of time and for hauling equipment necessary to make their own deliveries. This circumstance, together with the natural desire on the part of the factory to stimulate the production of a maximum supply of milk, led to the development and establishment in the localities where factories existed of so-called "milk routes." Their development naturally depended upon the quantity of milk deliverable, and this was ascertained through the investigations and solicitation of the condensery's so-called field man, whose functions consisted in solicitation of milk supply from farmers, the making of suggestions, and, as the name indicates, acting as a representative in the field of milk production in the vicinity of the factory. The routes, of course, were established when and where the supply justified. It was thereupon traveled each day by the hauler, whose duties consisted in taking the raw milk from farmers, hauling it to the factory, and returning to the farmers or dairymen the cans which they owned. Each can was designated by number corresponding to the number given to the particular farmer. The haulers supplied the equipment, such as horses, wagons, and canvas covers for the wagons. The milk company owned no teams or wagons used in hauling.

The general, and in particular, the compensation features of these hauling arrangements may be thus summarized: Written contracts with haulers were not entered into. The individual apparently made application to be assigned to the service, to have a "route." Doubtless in instances the formality of engagement was much like that attending engagements for ordinary service, or the initiation of the ordinary relation of master and servant; that is, the individual sought a "job." But, probably, the nature of the work and the customs attending it were such that the individual would regard the "getting of a milk route" as quite accurately descriptive of the relation.

The proof shows that since January, 1915, these companies paid the hauling charge, 15 cents per hundred, but that the provision for its payment was made in this way: The total deliveries were computed on the test basis, as that may be disclosed from day to day. A settlement slip carried these totals and computation, and there was a deduction of 15 cents per hundred pounds made against the particular farmer, and the balance covered by check. The deduction thus made was known as the hauler's charge, and obviously was the fund out of which the companies paid the hauler. If the farmer himself delivered the milk, no such deduction was made. The factory kept a record of the quantities delivered by each hauler, and the latter received monthly payment of the aggregate, based on the hauling rate of .15 cents per hundredweight.

Prior to January, 1915, there had been some variation from this custom, based upon the contingency of a hauler's load being less than a ton. But they are not material in determining the character of the relation.

Certain other facts may be noted. In some instances, as in the Demerow Case, the company guaranteed the hauler a minimum of $3 per day; that is, if his load during any day was less than a ton, he received $3 (that being 15 cents per hundredweight on a ton); whereas, if he hauled more than a ton, the compensation was 15 cents per hundredweight for all actually hauled on that day. So, too, in respect of the Meister claim, his was to be compensated at a flat rate of $80 per month, irrespective of quantity hauled. Each hauler had his own route.

Richmond, Jackman & Swansen, of Madison, Wis., for claimants. Sanborn & Blake, of Madison, Wis., for trustee.

GEIGER, District Judge (after stating the facts as above). Section 64b, subd. 4, of the Bankruptcy Act grants a priority of payment to "Wages due to workmen, clerks, or servants," etc., of a bankrupt. As above indicated, the only question is whether these claimants were workmen or servants of the bankrupts, entitled to the preferential treatment accorded by the statute. Obviously, elementary definitions of these terms cannot be very helpful. That a laborer is one who labors, a workman one who works, or, as Bouvier puts it, "one who is employed in some business for another," are truisms just as applicable to conceded instances of "independent contractor" as to conceded relations of master and servant. So, too, the fact that each claimant, as a part of his engagement, obligated himself to live up to certain specifications respecting the manner of performance does not distinguish the relation as one of master and servant from one of ordinary independent contract containing like specifications. Nor can the method of payment be the criterion, and therefore the attendant guaranty of a minimum per day in the one, or the monthly stipend in the other, of the two cases, is not determinative of the character of the relation.

If the fact that these claimants in discharging their engagement performed such manual or physical labor as is usually a proper subject of hiring a workman or servant were controlling, then obviously they are workmen or servants. But that rather begs the real question, which is, What was the relation wherein they performed their work or rendered their service? Remington on Bankruptcy (2d Ed.) § 2168 et seq. Now, in answering the question, it must, of course, be conceded that in making the arrangement for the hauling of milk it was essential to provide for the driving of the teams and the handling of milk cans, as well as for the actual hauling from the farmer to the factory by a team-drawn wagon. Neither could be dispensed with. But the result to be accomplished was the transportation by team and wagon, and that was the dominant subject of the relation created by the contract. And the fact that this involved necessarily and indispensably the attendant personal service of the owner of the team in driving the team, loading and unloading milk cans, does not bring into the situation the element which, as will be seen, affords the ultimate general test. That element is the subordination and personal subservience of a workman or servant to the one who engages him. That element is, in my judgment, lacking in the cases before us, just as it is in the everyday instances of expressmen, draymen, liverymen, cabmen, passenger, or freight transfer agencies. These common situations are never deemed to create the relation of master and servant, though frequently the service rendered and the method of compensation is identical with that appearing in the cases before us.

Another pertinent feature of the relation of claimants to these factories is found in the entire freedom to sublet, assign, or in any manner to delegate the performance of the obligation to another or to others. So, too, if the quantity of milk deliverable on any route shall prove to exceed the capacity of a single team, it would be permissible for any hauler to increase his equipment to meet the re-

quirements, to hire servants for that purpose, or in fact to do anything he pleased to meet the requirements of a route, if he cared to assume additional burdens in order to derive greater benefits. Of course, it does not appear that the latter ever happened, but the right to assign or delegate the performance of the obligation assumed seems entirely clear, and the personal subservience and subordination usually found in the relation of master and servant or workmen excludes that idea.

Counsel suggests that if one of claimants were injured while discharging his duties as a hauler he would probably be entitled to an award under the Workmen's Compensation Act. This, of course, involves the whole question respecting the relation existing. But if resort to analogies is to be had, we might also consider whether the negligence of a hauler—for example, in failing to hitch his team—could be imputed to the corporation operating the condensery, so as to render it liable to third persons injured by reason thereof.

It is my judgment that upon application of fair tests of independence or subservience the claims fall within the former class, and that adjudicated cases cited by the trustee support this view. Remington on Bankruptcy, supra; Re Zotti (D. C.) 23 Am. Bankr. Rep. 607, 178 Fed. 304; Re Crown Point Brush Co. (D. C.) 200 Fed. 882; Re Gurewitz, 121 Fed. 982, 58 C. C. A. 320; Re Mayer (D. C.) 101 Fed. 227; Spruks v. Lackawanna Dairy Co. (D. C.) 189 Fed. 287; Re Blakman Bros., 6 Chi. Leg. N. 18; Re Rose, 1 Am. Bankr. Rep. 68; Campfield v. Lang (C. C.) 25 Fed. 128; Farmer v. St. Croix Power Co., 117 Wis. 76, 93 N. W. 830, 98 Am. St. Rep. 914.

The conclusion is that the claims are not entitled to priority. An order may be entered, reversing the ruling of the referee accordingly.